73 So.3d 34 (2011)
Joelis JARDINES, Petitioner,
v.
STATE of Florida, Respondent.
No. SC08-2101.
Supreme Court of Florida.
April 14, 2011.
*35 Carlos J. Martinez, Public Defender, and Howard K. Blumberg, Assistant Public Defender, Eleventh Judicial Circuit, Miami, FL, for Petitioner.
Pamela Jo Bondi, Attorney General, Tallahassee, FL, Richard L. Polin, Bureau Chief, and Charmaine Millsaps, Assistant Attorneys General, Miami, FL, for Respondent.
Arthur T. Daus, III, Fort Lauderdale, FL, on behalf of Police K-9 Magazine and Canine Development Group, as Amicus Curiae.
PERRY, J.
We have for review State v. Jardines, 9 So.3d 1 (Fla. 3d DCA 2008), in which the district court certified conflict with State v. Rabb, 920 So.2d 1175 (Fla. 4th DCA 2006). We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. We quash the decision in Jardines and approve the result in Rabb.
Police conducted a warrantless "sniff test" by a drug detection dog at Jardines' home and discovered live marijuana plants inside. The trial court granted Jardines' motion to suppress the evidence, and the State appealed. The district court reversed, and Jardines sought review in this Court. Jardines claims that the warrantless "sniff test" violated his right against unreasonable searches under the Fourth Amendment. The issue presented here is *36 twofold: (i) whether a "sniff test" by a drug detection dog conducted at the front door of a private residence is a "search" under the Fourth Amendment and, if so, (ii) whether the evidentiary showing of wrongdoing that the government must make prior to conducting such a search is probable cause or reasonable suspicion.
The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." U.S. Const. amend. IV. The United States Supreme Court has held that "`[a]t the very core' of the Fourth Amendment `stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). Or, more succinctly, "[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." Kyllo, 533 U.S. at 31, 121 S.Ct. 2038.
First, the dog "sniff test" that was conducted in the present case was an intrusive procedure. As explained more fully below, the "sniff test" was a sophisticated undertaking that was the end result of a sustained and coordinated effort by various law enforcement agencies. On the scene, the procedure involved multiple police vehicles, multiple law enforcement personnel, including narcotics detectives and other officers, and an experienced dog handler and trained drug detection dog engaged in a vigorous search effort on the front porch of the residence. Tactical law enforcement personnel from various government agencies, both state and federal, were on the scene for surveillance and backup purposes. The entire on-the-scene government activityi.e., the preparation for the "sniff test," the test itself, and the aftermath, which culminated in the full-blown search of Jardines' homelasted for hours. The "sniff test" apparently took place in plain view of the general public. There was no anonymity for the resident.
Such a public spectacle unfolding in a residential neighborhood will invariably entail a degree of public opprobrium, humiliation and embarrassment for the resident, for such dramatic government activity in the eyes of manyneighbors, passers-by, and the public at largewill be viewed as an official accusation of crime. Further, if government agents can conduct a dog "sniff test" at a private residence without any prior evidentiary showing of wrongdoing, there is nothing to prevent the agents from applying the procedure in an arbitrary or discriminatory manner, or based on whim and fancy, at the home of any citizen. Such an open-ended policy invites overbearing and harassing conduct. Accordingly, we conclude that a "sniff test," such as the test that was conducted in the present case, is a substantial government intrusion into the sanctity of the home and constitutes a "search" within the meaning of the Fourth Amendment. As such, it must be preceded by an evidentiary showing of wrongdoing.
And second, we note that the parties in the present case have failed to point to a single case in which the United States Supreme Court has indicated that a search for evidence for use in a criminal prosecution, absent special needs beyond the normal need of law enforcement, may be based on anything other than probable cause. We assume that this is because, as explained more fully below, all that Court's precedent in this area indicates just the opposite. And that precedent, we recognize, *37 applies with extra force where the sanctity of the home is concerned. Accordingly, we conclude that probable cause, not reasonable suspicion, is the proper evidentiary showing of wrongdoing that the government must make prior to conducting a dog "sniff test" at a private residence.

I. BACKGROUND
On November 3, 2006, Detective Pedraja of the Miami-Dade Police Department received an unverified "crime stoppers" tip that the home of Joelis Jardines was being used to grow marijuana. One month later, on December 6, 2006, Detective Pedraja and Detective Bartlet and his drug detection dog, Franky, approached the residence. The underlying facts, which are discussed more fully below, are summarized briefly in the separate opinion of a district court judge in Jardines:
The Miami-Dade County Police Department received a Crime Stoppers tip that marijuana was being grown at the home of defendant-appellee Joelis Jardines. One month later the detective went to the home at 7 a.m. He watched the home for fifteen minutes. There were no vehicles in the driveway, the blinds were closed, and there was no observable activity.
After fifteen minutes, the dog handler arrived with the drug detection dog. The handler placed the dog on a leash and accompanied the dog up to the front door of the home. The dog alerted to the scent of contraband.
The handler told the detective that the dog had a positive alert for the odor of narcotics. The detective went up to the front door for the first time, and smelled marijuana. The detective also observed that the air conditioning unit had been running constantly for fifteen minutes or so, without ever switching off. [N. 8. According to the detective, in a hydroponics lab for growing marijuana, high intensity light bulbs are used which create heat. This causes the air conditioning unit to run continuously without cycling off.]
The detective prepared an affidavit[[1]] and applied for a search warrant, which *38 was issued. A search was conducted, which confirmed that marijuana was being grown inside the home. The defendant was arrested.
The defendant moved to suppress the evidence seized at his home. The trial court conducted an evidentiary hearing at which the detective and the dog handler testified. The trial court suppressed the evidence on authority of State v. Rabb.

Jardines, 9 So.3d at 10-11 (Cope, J., concurring in part and dissenting in part) (footnote omitted).
The State appealed the suppression ruling, and the district court reversed based on the following reasoning:
In sum, we reverse the order suppressing the evidence at issue. We conclude that no illegal search occurred. The officer had the right to go up to defendant's front door. Contrary to the holding in Rabb, a warrant was not necessary for the drug dog sniff, and the officer's sniff at the exterior door of defendant's home should not have been viewed as "fruit of the poisonous tree." The trial judge should have concluded substantial evidence supported the magistrate's determination that probable cause existed. Moreover, the evidence at issue should not have been suppressed because its discovery was inevitable. To the extent our analysis conflicts with Rabb, we certify direct conflict.
Jardines, 9 So.3d at 10 (footnote omitted). Jardines sought review in this Court based on certified conflict with State v. Rabb, 920 So.2d 1175 (Fla. 4th DCA 2006),[2] which we *39 granted.[3]

II. THE APPLICABLE LAW
The Fourth Amendment to the United States Constitution contains both the Search and Seizure Clause and the Warrant Clause and provides as follows in full:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const. amend. IV.[4] With respect to the meaning of the amendment, the courts have come to accept the formulation set forth by Justice Harlan in Katz[5]:
As the Court's opinion states, "the Fourth Amendment protects people, not places." The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a "place." My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable." Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the "plain view" of outsiders are not "protected" because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable.
Katz, 389 U.S. at 361, 88 S.Ct. 507 (emphasis added) (Harlan, J., concurring); see California v. Ciraolo, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) *40 ("Katz posits a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?"). In sum, "wherever an individual may harbor a `reasonable expectation of privacy' he is entitled to be free from unreasonable governmental intrusion." Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (quoting Katz, 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring)).

A. Federal "Dog Sniff" Cases

The United States Supreme Court has addressed the issue of "sniff tests" by drug detection dogs in three cases. First, in United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), that Court addressed the issue of whether police, based on reasonable suspicion, could temporarily seize a piece of luggage at an airport and then subject the luggage to a "sniff test" by a drug detection dog. After Place's behavior at an airport aroused suspicion, police seized his luggage and subjected it to a "sniff test" by a drug detection dog at another airport and ultimately discovered cocaine inside. The federal district court denied Place's motion to suppress, and the court of appeals reversed. The United States Supreme Court affirmed, concluding that the seizure, which lasted ninety minutes, was an impermissibly long Terry[6] stop, but the Court ruled as follows with respect to the dog "sniff test":
The Fourth Amendment "protects people from unreasonable government intrusions into their legitimate expectations of privacy." We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment. A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.
In these respects, the canine sniff is sui generis. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here exposure of respondent's luggage, which was located in a public place, to a trained caninedid not constitute a "search" within the meaning of the Fourth Amendment.
Place, 462 U.S. at 706-07, 103 S.Ct. 2637 (quoting United States v. Chadwick, 433 U.S. 1, 7, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977)).
*41 Second, in City of Indianapolis v. Edmond, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), the United States Supreme Court addressed the issue of whether police could stop a vehicle at a drug interdiction checkpoint and subject the exterior of the vehicle to a "sniff test" by a drug detection dog. Police stopped Edmond and other motorists at a dragnet-style drug interdiction checkpoint, and a drug detection dog was walked around the exterior of each vehicle. Later, Edmond filed a class action lawsuit against the city, claiming that the checkpoints violated his Fourth Amendment rights, and he sought a preliminary injunction barring the practice. The federal district court denied the injunction, and the court of appeals reversed. The United States Supreme Court affirmed, explaining that "[w]e have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing." Edmond, 531 U.S. at 41, 121 S.Ct. 447. With respect to the dog "sniff test," the Court stated as follows:
It is well established that a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment. The fact that officers walk a narcotics-detection dog around the exterior of each car at the Indianapolis checkpoints does not transform the seizure into a search. See United States v. Place, 462 U.S. 696 [103 S.Ct. 2637, 77 L.Ed.2d 110] (1983). Just as in Place, an exterior sniff of an automobile does not require entry into the car and is not designed to disclose any information other than the presence or absence of narcotics. See ibid. Like the dog sniff in Place, a sniff by a dog that simply walks around a car is "much less intrusive than a typical search." Ibid.

Edmond, 531 U.S. at 40, 121 S.Ct. 447 (citation omitted) (quoting Place, 462 U.S. at 707, 103 S.Ct. 2637).
And third, in Illinois v. Caballes, 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005), the United States Supreme Court addressed the issue of whether police, during the course of a lawful traffic stop, could subject the exterior of a vehicle to a "sniff test" by a drug detection dog. After Caballes was stopped for speeding and while the officer was writing the citation, a second officer arrived at the scene and subjected the exterior of the vehicle to a dog "sniff test." The dog alerted at the trunk and the officers searched the trunk and found marijuana. The state trial court denied Caballes' motion to suppress, and the Illinois Supreme Court reversed. The United States Supreme Court reversed, ruling as follows:
Official conduct that does not "compromise any legitimate interest in privacy" is not a search subject to the Fourth Amendment. Jacobsen, 466 U.S., at 123 [104 S.Ct. 1652]. We have held that any interest in possessing contraband cannot be deemed "legitimate," and thus, governmental conduct that only reveals the possession of contraband "compromises no legitimate privacy interest." Ibid. This is because the expectation "that certain facts will not come to the attention of the authorities" is not the same as an interest in "privacy that society is prepared to consider reasonable." Id., at 122 [104 S.Ct. 1652] (punctuation omitted). In United States v. Place, 462 U.S. 696 [103 S.Ct. 2637, 77 L.Ed.2d 110] (1983), we treated a canine sniff by a well-trained narcotics-detection dog as "sui generis" because it "discloses only the presence or absence of narcotics, a contraband item." Id., at 707 [103 S.Ct. 2637]; see also Indianapolis v. Edmond, 531 U.S. 32, 40 [121 S.Ct. 447, 148 L.Ed.2d 333] (2000). Respondent likewise *42 concedes that "drug sniffs are designed, and if properly conducted are generally likely, to reveal only the presence of contraband." Although respondent argues that the error rates, particularly the existence of false positives, call into question the premise that drug-detection dogs alert only to contraband, the record contains no evidence or findings that support his argument. Moreover, respondent does not suggest that an erroneous alert, in and of itself, reveals any legitimate private information, and, in this case, the trial judge found that the dog sniff was sufficiently reliable to establish probable cause to conduct a full-blown search of the trunk.
Accordingly, the use of a well-trained narcotics-detection dog-one that "does not expose noncontraband items that otherwise would remain hidden from public view," Place, 462 U.S., at 707 [103 S.Ct. 2637]-during a lawful traffic stop generally does not implicate legitimate privacy interests. In this case, the dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation. Any intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement.
Caballes, 543 U.S. at 408-09, 125 S.Ct. 834 (citation omitted).
Further, the Court in Caballes distinguished its ruling in Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), as follows:
This conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search. Kyllo v. United States, 533 U.S. 27 [121 S.Ct. 2038, 150 L.Ed.2d 94] (2001). Critical to that decision was the fact that the device was capable of detecting lawful activityin that case, intimate details in a home, such as "at what hour each night the lady of the house takes her daily sauna and bath." Id., at 38 [121 S.Ct. 2038]. The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car. A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.
Caballes, 543 U.S. at 409-10, 125 S.Ct. 834.

B. Two Additional Federal Cases

In two additional cases, the United States Supreme Court has addressed Fourth Amendment issues that are relevant here. First, in United States v. Jacobsen, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), the Court addressed the issue of whether police, without a showing of probable cause, could temporarily seize and inspect a small portion of the contents of a package, which had been damaged in transit and was being held by a private shipping company, and then subject the contents to a field test for cocaine. After employees of a private freight carrier discovered a suspicious white powder in a damaged package and notified federal agents, the agents conducted a field chemical test on the powder and determined that it was cocaine. The federal district court denied Jacobsen's motion to suppress, and the court of appeals reversed. The United States Supreme Court reversed, reasoning as follows:
A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy. This conclusion *43 is not dependent on the result of any particular test. It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised. But even if the results are negativemerely disclosing that the substance is something other than cocainesuch a result reveals nothing of special interest. Congress has decidedand there is no question about its power to do soto treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.
This conclusion is dictated by United States v. Place, 462 U.S. 696 [103 S.Ct. 2637, 77 L.Ed.2d 110] (1983), in which the Court held that subjecting luggage to a "sniff test" by a trained narcotics detection dog was not a "search" within the meaning of the Fourth Amendment....
Here, as in Place, the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.
Jacobsen, 466 U.S. at 123-24 [104 S.Ct. 1652] (footnote omitted).
And second, in Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), the United States Supreme Court addressed the issue of whether police, without a warrant, could use a thermal-imaging device to scan a private home to determine if the amount of heat generated by the home was consistent with the use of high-intensity lamps used in growing marijuana. After federal agents became suspicious that Kyllo was growing marijuana in his home, agents scanned the outside of the triplex with a thermal-imaging device, which showed that the garage roof and side of the residence were inordinately warm. The agents obtained a warrant and searched the residence and found live marijuana plants inside. The federal district court denied Kyllo's motion to suppress, and the circuit court affirmed. The United States Supreme Court reversed, reasoning as follows:
The Katz testwhether the individual has an expectation of privacy that society is prepared to recognize as reasonablehas often been criticized as circular, and hence subjective and unpredictable. While it may be difficult to refine Katz when the search of areas such as telephone booths, automobiles, or even the curtilage and uncovered portions of residences is at issue, in the case of the search of the interior of homesthe prototypical and hence most commonly litigated area of protected privacythere is a ready criterion, with roots deep in the common law, of the minimal expectation of privacy that exists, and that is acknowledged to be reasonable. To withdraw protection of this minimum expectation would be to permit police technology to erode the privacy guaranteed by the Fourth Amendment. We think that obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical "intrusion into a constitutionally protected area" constitutes a searchat least where (as here) the technology in question is not in general public use. This assures preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted. On the basis of this criterion, *44 the information obtained by the thermal imager in this case was the product of a search.
....
We have said that the Fourth Amendment draws "a firm line at the entrance to the house." That line, we think, must be not only firm but also brightwhich requires clear specification of those methods of surveillance that require a warrant. While it is certainly possible to conclude from the videotape of the thermal imaging that occurred in this case that no "significant" compromise of the homeowner's privacy has occurred, we must take the long view, from the original meaning of the Fourth Amendment forward.
"The Fourth Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens." Carroll v. United States, 267 U.S. 132, 149 [45 S.Ct. 280, 69 L.Ed. 543] (1925).
Where, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a "search" and is presumptively unreasonable without a warrant.
Kyllo, 533 U.S. at 34-40, 121 S.Ct. 2038 (citations omitted) (quoting Silverman, 365 U.S. at 512, 81 S.Ct. 679; Payton v. New York, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)).

III. ANALYSIS
As noted above, the issue raised in the present case is twofold: (i) whether a "sniff test" by a drug detection dog conducted at the front door of a private residence is a "search" under the Fourth Amendment and, if so, (ii) whether the evidentiary showing of wrongdoing that the government must make prior to conducting such a search is probable cause or reasonable suspicion.

A. The Federal "Dog Sniff" Cases Are Inapplicable to the Home

For reasons explained below, we conclude that the analysis used in the above federal "dog sniff" cases is inapplicable to a "sniff test" conducted at a private home. First, we recognize that the United States Supreme Court has ruled that because a "sniff test" conducted by a drug detection dog is "sui generis," or unique, in the sense that it is minimally intrusive and is designed to detect only illicit drugs and nothing more, Place, 462 U.S. at 707, 103 S.Ct. 2637, a dog "sniff test" does not implicate Fourth Amendment rights when employed in the following settings: (i) when conducted on luggage that has been seized at an airport based on reasonable suspicion of unlawful activity, where the luggage has been separated from its owner and the "sniff test" is conducted in a public place, see Place, 462 U.S. 696, 103 S.Ct. 2637; (ii) when conducted on the exterior of a vehicle that has been stopped in a dragnet-style stop at a drug interdiction checkpoint, see Edmond, 531 U.S. 32, 121 S.Ct. 447; and (iii) when conducted on the exterior of a vehicle that has been subjected to a lawful traffic stop. See Caballes, 543 U.S. 405, 125 S.Ct. 834. Further, the United States Supreme Court has applied a similar analysis to a chemical "field test" for drugs when conducted on the contents of a package that has been damaged in transit and is being held by a private shipping company. See Jacobsen, 466 U.S. 109, 104 S.Ct. 1652.
We note, however, that in each of the above cases, the United States Supreme Court was careful to tie its ruling to the particular facts of the case. See Place, 462 *45 U.S. at 707, 103 S.Ct. 2637 ("[W]e conclude that the particular course of investigation that the agents intended to pursue here exposure of respondent's luggage, which was located in a public place, to a trained caninedid not constitute a `search' within the meaning of the Fourth Amendment."); Edmond, 531 U.S. at 40, 121 S.Ct. 447 ("The fact that officers walk a narcotics-detection dog around the exterior of each car at the Indianapolis checkpoints does not transform the seizure into a search."); Caballes, 543 U.S. at 409, 125 S.Ct. 834 ("In this case, the dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation. Any intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement."); Jacobsen, 466 U.S. at 123, 104 S.Ct. 1652 ("It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised."). Nothing in the above cases indicates that the same analysis would apply to a dog "sniff test" conducted at a private residence.
Significantly, all the sniff and field tests in the above cases were conducted in a minimally intrusive manner upon objects luggage at an airport in Place, vehicles on the roadside in Edmond and Caballes, and a package in transit in Jacobsenthat warrant no special protection under the Fourth Amendment. All the tests were conducted in an impersonal manner that subjected the defendants to no untoward level of public opprobrium, humiliation or embarrassment. There was no public link between the defendants and the luggage as it was being tested in Place or the package as it was being tested in Jacobsen, and the defendants retained a degree of anonymity during the roadside testing of their vehicles in Edmond and Caballes. Further, and more important, under the particular circumstances of each of the above cases, the tests were not susceptible to being employed in a discriminatory or arbitrary mannerthe luggage in Place had been seized based on reasonable suspicion; the vehicle in Edmond had been seized in a dragnet-style stop; the vehicle in Caballes had been seized pursuant to a lawful traffic stop; and the contents of the package in Jacobsen had been seized after the package had been damaged in transit by a private carrier. All these objects were seized and tested in an objective and nondiscriminatory manner, and there was no evidence of overbearing or harassing government conduct. There was no need for Fourth Amendment protection. As explained below, however, such is not the case with respect to a dog "sniff test" conducted at a private residence.

B. "Sniff Test" at a Private Home

As noted above, the United States Supreme Court has held that "wherever an individual may harbor a reasonable `expectation of privacy,' he is entitled to be free from unreasonable government intrusion." Terry, 392 U.S. at 9, 88 S.Ct. 1868 (quoting Katz, 389 U.S. at 351, 88 S.Ct. 507 (Harlan, J., concurring)). Nowhere is this right more resolute than in the private home: "`At the very core' of the Fourth Amendment `stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" Kyllo, 533 U.S. at 31, 121 S.Ct. 2038 (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). The sanctity of the citizen's home is a basic tenet of Anglo-American jurisprudence:
In 1604, an English court made the now-famous observation that "the house of every one is to him as his castle and fortress, as well for his defence against *46 injury and violence, as for his repose." Semayne's Case, 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 195 (K.B.). In his Commentaries on the Laws of England, William Blackstone noted that
"the law of England has so particular and tender a regard to the immunity of a man's house, that it stiles it his castle, and will never suffer it to be violated with impunity: agreeing herein with the sentiments of ancient Rome.... For this reason no doors can in general be broken open to execute any civil process; though, in criminal causes, the public safety supersedes the private." 4 Commentaries 223 (1765-1769).
The Fourth Amendment embodies this centuries-old principle of respect for the privacy of the home....
Wilson v. Layne, 526 U.S. 603, 609-10, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); see also United States v. United States Dist. Court for Eastern Dist. of Mich., 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed....").
Although police generally may initiate a "knock and talk" encounter at the front door of a private residence without any prior showing of wrongdoing, see State v. Morsman, 394 So.2d 408, 409 (Fla.1981) ("Under Florida law it is clear that one does not harbor an expectation of privacy on a front porch where salesmen or visitors may appear at any time."), a dog "sniff test" is a qualitatively different matter. Contrary to popular belief, a "sniff test" conducted at a private residence is not necessarily a casual affair in which a canine officer and dog approach the front door and the dog then performs a subtle "sniff test" and signals an "alert" if drugs are detected. Quite the contrary. In the present case, for instance, on the morning of December 5, 2006, members of the Miami-Dade Police Department, Narcotics Bureau, and agents of the Drug Enforcement Administration (DEA), United States Department of Justice, conducted a surveillance of Jardines' home. As Detectives Pedraja and Bartlet and the drug detection dog, Franky, approached the residence, Sergeant Ramirez and Detective Donnelly of the Miami-Dade Police Department established perimeter positions around the residence and federal DEA agents assumed stand-by positions as backup units.
The "sniff test" conducted by the dog handler and his dog was a vigorous and intensive procedure. Detective Bartlet testified as follows on direct examination at the suppression hearing:
Q. After you stepped onto the property, what did you do?
A. I, basically, approached with my canine partner. The way my canine partner works, he is very strongly driven, so he is actually out in front of me. He is one of the dogs that will actually pull me around very dramatically.
So he pulled directly up the porch as he is trained to do, and immediately upon crossing the threshold of the archway which you see here, upon entering the alcove of the porch, he began tracking an airborne odor.
Q. Let me stop you there, Officer.
A. Sure.
Q. At this time in time, how far into this home did you get or into the entranceway of the home did you get? I want you to point to the Court.
A. You see there's a walker there? That's about the area that it was I was in.
Q. There is also an archway there. Did you ever cross in through that archway?

*47 A. Not that I recall, no.
Q. So, where exactly was your dog when he alerted to an alert of contraband?
A. The alert for the dog, basically, is the minute I observed out of normal behavior for him.
In this particular case, the abnormal behavior would have been the head high, tracking the airborne odor. He began tracking that airborne odor by bracketing and tracking back and forth.
Q. What exactly is bracketing?
A. Bracketing is a technique that the dog uses once he comes to an odor which is basically you can think of it as a cloud of odor.
Once he gets into that cloud of odor, he is trained to go to the strongest point. We call that source.
So, he is bracketing back and forth, back and forth, within the cone of odor to determine the strongest source. In this particular residence source for him was the base of the door.
Q. And is Detective Pedraja observing this as well? You can't speak for him?
A. Yeah, Ito be honest with you, all I'm doing is concentrating on the dog, watching the dog's head movements, his body postures, whence he is indicating towards me.
Q. Detective, your dog is on a leash at that point?
A. Oh, absolutely.
Q. How long is that leash?
A. It's approximately six feet. And then you have the length of my arm, so you can assume from there.
Q. Okay. Once the dog beganwhat is it the dog did that told you he had an alert?
A. Okay. He immediately told me he had an alert when he began tracking that odor. Now I know he is in odor and he needs to find source.
So, what I do is I get back as far as I can. I let him have the full six feet of the leash plus whatever safe distance I can give him without running off in order for him to determine where source is.
For example, if I don't do that, source could be the motorcycle, it could be somewhere else other than the front door.
So, in order for me to fully observe his alert and where the source is, I need to be creating as much distance as I can.
Often handlers will drop the leash and walk away completely. I don't do that with him because he is a little bit wild, so I maintain control of the leash and observe him from a distance so that I can indicate where source is going to be.
Q. Okay. So, once he detects a source and he is bracketing and he is doing this behavior, what is the next thing that you observe this dog do?
A. The final culmination of his abnormal behavior is a sitting position, and he did that immediately following the sniff at the base of the door, which indicates source to me.
Q. And once Franky, your dog, did that, what did you then do?
A. I then pulled him off of the sit and returned to my vehicle.
Q. Did you at any point in time communicate what the dog did to anybody?
A. Yeah, I indicated to the lead detective that there was a positive alert for the odor of narcotics.
Q. And where exactly, in what direction around you, was the detective at that point?
A. He would have been behind me, so I passed him up in the driveway.

*48 Q. Once you pulled the dog away from the door, where did you then go?
A. To my vehicle.
With respect to the location of Detective Pedraja in relation to Detective Bartlet and Franky during the "sniff test," Bartlet testified as follows on redirect examination at the suppression hearing:
Q. Would Detective Pedraja be in front of you as you are conducting canineI don't even know what you would call it.
....
[A.] Would he be in front ofwhile Franky is sniffing the door? Definitely not.
Q. Why not?
A. Because he would be obstructing his ability to perform. He would be blocking him. He would beif he was standing in front of the door, Franky may not be able to get to source. So he needs to be out of the way.
Q. Was Detective Pedraja standing next to you?
A. No.
Q. Why not?
A. Because he probably would get knocked over by Franky when Franky is spinning around trying to find source.
[THE PROSECUTOR]: No further questions.
After the "sniff test" was completed, Detective Bartlet and Franky left the scene to assist in another case. Detective Pedraja, after waiting at the residence for fifteen or twenty minutes, also left the scene to prepare a search warrant and to submit it to a magistrate. Federal DEA agents, however, remained behind to maintain surveillance of Jardines' home. Pedraja obtained a search warrant later that day and returned to the scene. About an hour later, members of the Miami-Dade Police Department, Narcotics Bureau, and DEA agents executed the warrant by gaining entry to Jardines' home through the front door. As agents entered the front door, Jardines exited through a sliding glass door at the rear of the house. He was apprehended by Special Agent Wilson of the DEA and was turned over to the Miami-Dade Police Department. He was charged with trafficking in marijuana and theft of electricity.
Based on the foregoing, we conclude that the dog "sniff test" that was conducted here was an intrusive procedure. The "sniff test" was a sophisticated undertaking that was the end result of a sustained and coordinated effort by various law enforcement departments. On the scene, the procedure involved multiple police vehicles, multiple law enforcement personnel, including narcotics detectives and other officers, and an experienced dog handler and trained drug detection dog engaged in a vigorous search effort on the front porch of the residence. Tactical law enforcement personnel from various government agencies, both state and federal, were on the scene for surveillance and backup purposes. The entire on-the-scene government activityi.e., the preparation for the "sniff test," the test itself, and the aftermath, which culminated in the full-blown search of Jardines' homelasted for hours. The "sniff test" apparently took place in plain view of the general public. There was no anonymity for the resident.
Such a public spectacle unfolding in a residential neighborhood will invariably entail a degree of public opprobrium, humiliation and embarrassment for the resident, whether or not he or she is present at the time of the search, for such dramatic government activity in the eyes of many-neighbors, passers-by, and the public at large-will be viewed as an official accusation of crime. Cf. Place, 462 U.S. at 707, 103 S.Ct. 2637 (explaining that the dog *49 "sniff test" in that case was not a "search" within the meaning of the Fourth Amendment because it was limited in scope and was anonymous and did not subject the individual to "embarrassment and inconvenience"). And if the resident happens to be present at the time of the "sniff test," such an intrusion into the sanctity of his or her home will generally be a frightening and harrowing experience that could prompt a reflexive or unpredictable response.
Further, all the underlying circumstances that were present in the above federal "dog sniff" and "field test" cases that guaranteed objective, uniform application of those testsi.e., the temporary seizure of luggage based on reasonable suspicion of criminal activity in Place; the temporary seizure of a vehicle in a dragnet-style stop at a drug interdiction checkpoint in Edmond; the temporary seizure of a vehicle based on a lawful traffic stop in Caballes; and the temporary seizure of a portion of the contents of a package that had been damaged in transit in Jacobsenare absent from a warrantless "sniff test" conducted at a private residence. Unlike the objects in those cases, a private residence is not susceptible to being seized beforehand based on objective criteria. Thus, if government agents can conduct a dog "sniff test" at a private residence without any prior evidentiary showing of wrongdoing, there is simply nothing to prevent the agents from applying the procedure in an arbitrary or discriminatory manner, or based on whim and fancy, at the home of any citizen. Cf. Camara v. Mun. Court of City & Cnty. of S. F., 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) ("The basic purpose of [the Fourth] Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials."). Such an open-ended policy invites overbearing and harassing conduct.[7]
In sum, a "sniff test" by a drug detection dog conducted at a private residence does not only reveal the presence of contraband, as was the case in the federal "sui generis" dog sniff cases discussed above, but it also constitutes an intrusive procedure that may expose the resident to public opprobrium, humiliation and embarrassment, and it raises the specter of arbitrary and discriminatory application. Given the special status accorded a citizen's home under the Fourth Amendment, we conclude that a "sniff test," such as the test that was conducted in the present case, is a substantial government intrusion into the sanctity of the home and constitutes a "search" within the meaning of the Fourth Amendment. As such, it warrants the safeguards that inhere in that amendmentspecifically, the search must be preceded by an evidentiary showing of wrongdoing. We note that the rulings of other state[8] and federal[9] courts with respect *50 to a dog "sniff test" conducted at a private residence are generally mixed, as are the rulings of other state[10] and federal[11] courts with respect a dog "sniff test" conducted at an apartment or other temporary dwelling.

C. The Requirement of Probable Cause

As noted above, the Warrant Clause of the Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The United States Supreme Court has noted the key protective role that this clause plays with respect to private property:
Though there has been general agreement as to the fundamental purpose of the Fourth Amendment, translation of the abstract prohibition against "unreasonable searches and seizures" into workable guidelines for the decision of particular cases is a difficult task which has for many years divided the members of this Court. Nevertheless, one governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is "unreasonable" unless it has been authorized by a valid search warrant.
Camara, 387 U.S. at 528-29, 87 S.Ct. 1727. Specifically, with respect to the home, that Court has noted as follows:

*51 The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.
Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948); see also Welsh v. Wisconsin, 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) ("[A] principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest."). Or, more succinctly: "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." Kyllo, 533 U.S. at 31, 121 S.Ct. 2038; see also Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ("It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.") (internal quotation marks omitted).
The Court of Appeals for the District of Columbia in United States v. Colyer, 878 F.2d 469 (D.C.Cir.1989), was confronted with the following question: if a dog "sniff test" is a "search" under the Fourth Amendment and must be preceded by an evidentiary showing of wrongdoing, must that showing be probable cause, or reasonable suspicion? That court addressed the question at length:
In his concurring opinion in Place, Justice Blackmun suggested that "a dog sniff may be a search, but a minimally intrusive one that could be justified in this situation under Terry upon a mere reasonable suspicion." 462 U.S. at 723 [103 S.Ct. 2637] (Blackmun, J., concurring in judgment). We find ourselves hard pressed for authority from the Supreme Court to support Justice Blackmun's underlying premisethat there is a category of "minimally intrusive" searches that are supportable under Terry on less than probable cause.
It is certainly true that the Supreme Court has upheld a wide variety of searches on less than probable cause as traditionally understood, but in no case was a law-enforcement search denominated "minimally intrusive." Indeed, the Supreme Court's opinion in Arizona v. Hicks, [480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987)] may indicate that the contrary is the case, i.e., that the Fourth Amendment knows no search but a "full-blown search." Hicks, 480 U.S. at 328 [107 S.Ct. 1149] ("A search is a search, even if it happens to disclose nothing but the bottom of a turntable."). Compare id. with id. at 333 [107 S.Ct. 1149] (O'Connor, J., dissenting) ("distin[guishing] between searches based on their relative intrusiveness ... is entirely consistent with our Fourth Amendment jurisprudence").
Rather than interpreting Terry as broad authority for the proposition that minimally intrusive searches may be justified on the basis of reasonable suspicion, the Supreme Court has on several occasions limited Terry to its precise underpinnings, i.e., protective searches for weapons. See Dunaway v. New York, 442 U.S. 200, 210 [99 S.Ct. 2248, 60 L.Ed.2d 824] (1979) (Terry is directed to "limited, on-the-street frisk[s] for weapons."). Indeed, the Court has gone so far as to say that Terry provides no support for "any search whatever for anything but weapons." Ybarra v. Illinois, 444 U.S. 85, 93-94 [100 S.Ct. 338, 62 L.Ed.2d 238] (1979). See also Pennsylvania *52 v. Mimms, 434 U.S. 106, 110 [98 S.Ct. 330, 54 L.Ed.2d 331] (1977) (per curiam); Sibron v. New York, 392 U.S. 40, 64-65 [88 S.Ct. 1889, 20 L.Ed.2d 917] (1968) ("The search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception-the protection of the officer by disarming a potentially dangerous man."). Thus, Professor LaFave seems correct in concluding that "there is no search-for-evidence counterpart to the Terry weapons search, permissible on only a reasonable suspicion that such evidence would be found." [3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 9.4(g), at 539 (2d ed. 1987)].
However, Terry does represent one of a lengthy line of cases in which the Supreme Court has upheld a search or seizure "[w]here a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause." New Jersey v. T.L.O., 469 U.S. 325, 341 [105 S.Ct. 733, 83 L.Ed.2d 720] (1985). Yet a careful reading of the Supreme Court's teachings leaves us doubtful that "reasonableness balancing" is appropriate in the context of the present case. Five times in as many years the Court has indicated that balancing is only appropriate when warranted by "special needs, beyond the normal need for law enforcement." See Skinner v. Railway Labor Executives' Assoc., 489 U.S. 602 [109 S.Ct. 1402, 103 L.Ed.2d 639] (1989); National Treasury Employees Union v. Von Raab, 489 U.S. 656 [109 S.Ct. 1384, 103 L.Ed.2d 685] (1989); Griffin v. Wisconsin, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); O'Connor v. Ortega, [480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987)]; New Jersey v. T.L.O., 469 U.S. at 351 [105 S.Ct. 733] (Blackmun, J., concurring in judgment).
This interpretation explains the various cases in which the Supreme Court has held searches to be lawful despite the absence of probable cause as traditionally understood. See T.L.O., 469 U.S. 325 [105 S.Ct. 733] (search by school official of student's purse); O'Connor, 480 U.S. 709 [107 S.Ct. 1492] (work-related search by governmental employer); Griffin, 483 U.S. [at] 873-74 [107 S.Ct. 3164] (search of probationer's home); Camara v. Municipal Court, 387 U.S. 523 [87 S.Ct. 1727, 18 L.Ed.2d 930] (1967) (housing inspections); New York v. Burger, [482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987)] (inspections of highly regulated business premises); Donovan v. Dewey, 452 U.S. 594 [101 S.Ct. 2534, 69 L.Ed.2d 262] (1981) (inspections of underground mines); Bell v. Wolfish, 441 U.S. 520, 558-60 [99 S.Ct. 1861, 60 L.Ed.2d 447] (1979) (body cavity searches of prison inmates); United States v. Brignoni-Ponce, 422 U.S. 873, 880-81 [95 S.Ct. 2574, 45 L.Ed.2d 607] (1975) (border patrols); United States v. Biswell, 406 U.S. 311, 316 [92 S.Ct. 1593, 32 L.Ed.2d 87] (1972) (inspections of "pervasively regulated business" for compliance with Gun Control Act); Terry, 392 U.S. 1 [88 S.Ct. 1868] (search for weapons, to protect officer and public). In no case has the Supreme Court indicated that a search for evidence qua evidence might qualify as a "special need" that would warrant reasonableness balancing. Common sense suggests that it is not.
To be sure, the Supreme Court has upheld on reasonable suspicion a variety of "minimally intrusive" seizures in contexts different from the "stop and frisk" originally approved in Terry. In such *53 cases, the "`seizures' [were] so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment `seizures' reasonable could be replaced by a balancing test." Dunaway v. New York, 442 U.S. at 210 [99 S.Ct. 2248]. See, e.g., United States v. Sharpe, 470 U.S. 675, 685 [105 S.Ct. 1568, 84 L.Ed.2d 605] (1985) (investigative stop of vehicle); Delaware v. Prouse, 440 U.S. 648 [99 S.Ct. 1391, 59 L.Ed.2d 660] (1979) (random checks for drivers' licenses and vehicle registration); United States v. Brignoni-Ponce, 422 U.S. at 880-81 [95 S.Ct. 2574] (brief investigative stop of motorists near border for questioning; analogizing situation to encounter addressed in Terry); see also United States v. Villamonte-Marquez, 462 U.S. 579, 592 [103 S.Ct. 2573, 77 L.Ed.2d 22] (1983) (random seizure of vessel in order to examine manifest); United States v. Martinez-Fuerte, 428 U.S. [543, 560, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)] (brief random checkpoint questioning for aliens). Although there may be no compelling reason to differentiate between seizures on the basis of their intrusiveness and failing to likewise differentiate between types of searches, the fact remains that we are unable to point to a single Supreme Court case that has upheld a search on reasonable suspicion merely because it was minimally intrusive. See, e.g., Michigan v. Long, 463 U.S. 1032 [103 S.Ct. 3469, 77 L.Ed.2d 1201] (1983); Pennsylvania v. Mimms, 434 U.S. 106 [98 S.Ct. 330, 54 L.Ed.2d 331] (1977) (per curiam); Adams v. Williams, 407 U.S. 143 [92 S.Ct. 1921, 32 L.Ed.2d 612] (1972); cf. Martinez-Fuerte, 428 U.S. at 561 [96 S.Ct. 3074] (upholding as reasonable a random seizure and noting that it was not dealing with a search).
Colyer, 878 F.2d at 477-79 (citations omitted).
Professor LaFave has reached the same conclusion with respect to the issue of probable cause versus reasonable suspicion:
Assuming now that some uses of these dogs constitutes a search, it does not inevitably follow that they should be encumbered by the restrictions ordinarily applicable to other types of searches which are clearly more intrusive in character. While it has sometimes been asserted that if the use of trained dogs is a search then such surveillance is unconstitutional if conducted in absence of a warrant supported by probable cause, it may be argued that the Fourth Amendment does not demand such a result. In Terry v. Ohio, the Court upheld a limited warrantless search made upon less than full probable cause "by balancing the need to search ... against the invasion which the search ... entails," and thus a similar approach might be taken as to the kind of search here under discussion. Although there are sound reasons for not employing too generously a graduated model of the fourth amendment, the notion that searches by use of dogs trained to detect narcotics... is a lesser intrusion subject to lesser Fourth Amendment restrictions is an appealing one. This is because this particular investigative technique is a distinct police practice which quite obviously is much less intrusive than other searches. It seems rather unlikely, however, that the Supreme Court would now reach such a conclusion. The Court has declared that the Fourth Amendment knows no search but a "full-blown search," asserted that Terry provides no support for "any search whatever for anything but weapons," and cautioned that the balancing process is appropriate only when warranted by "special needs *54 beyond the normal need of law enforcement."
1 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.2(g), at 540-41 (4th ed. 2004) (quotation marks and footnotes omitted).
We agree with the above analyses and note that the parties in the present case have failed to point to a single case in which the United States Supreme Court has indicated that a search for evidence for use in a criminal prosecution, absent special needs beyond the normal need of law enforcement, may be based on anything other than probable cause. We assume that this is because, as noted in the commentary above, all that Court's precedent in this area indicates just the opposite. And that precedent, we recognize, applies with extra force where the sanctity of the home is concerned. Accordingly, we conclude that probable cause, not reasonable suspicion, is the proper evidentiary showing of wrongdoing that the government must make under the Fourth Amendment prior to conducting a dog "sniff test" at a private residence.

IV. THE SUPPRESSION RULING
A magistrate's determination that probable cause exists for issuance of a search warrant is entitled to great deference when a trial court is considering a motion to suppress. Illinois v. Gates, 462 U.S. 213, 238-39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("[T]he duty of a reviewing court is simply to ensure that the magistrate had a `substantial basis for ... conclud[ing] that' probable cause existed."). And a trial court's ruling on a motion to suppress in such a case is subject to the following standard of review: the reviewing court must defer to the trial court's factual findings if supported by competent, substantial evidence but must review the trial court's ultimate ruling in-dependently, or de novo. State v. Glatzmayer, 789 So.2d 297, 301 n. 7 (Fla.2001); see also Connor v. State, 803 So.2d 598 (Fla.2001).
In the present case, the trial court granted Jardines' motion to suppress, ruling as follows:
This cause having come before this Court on Defendant, Joelis Alex Jardines', motion to suppress evidence seized from his house and this Court having reviewed the motion, the arguments of counsel, the court file and the records in this case, and being otherwise fully advised in the premises therein:
A drug detector dog was used to support probable cause for the issuance of a search warrant of the Defendant's house. The Defendant moved to suppress the evidence of drugs recovered from his house as a result of the search warrant. Pursuant to State v. Rabb, 920 So.2d 1175 (Fla. 4th DCA 2006), this Court concludes that law enforcement's use of a drug detector dog at the Defendant's house door constituted an unreasonable and illegal search.
However, the Court must also consider, absent the dog sniff information, whether any independent and lawfully obtained evidence establishes a substantial basis for concluding that probable cause existed to support the issuance of a search warrant for the Defendant's house.
The probable cause affidavit listed the information provided from a crime stoppers tip that marijuana was being grown at the residence as a basis to support probable cause for the issuance of a search warrant. However, the crime stoppers tip was unverified and came from an unknown individual rather than a qualified confidential informant. Additionally, there was no evidence to suggest *55 the crime stoppers tip was corroborated by any evidence resulting from surveillance of the house. The only other evidence contained in the affidavit was that the window blinds were closed and the air conditioner unit was constantly running without recycling. This information, considered in its totality, simply does not suggest a fair probability of any broader criminal activity, such as the growing of marijuana in the Defendant's house. Therefore, this Court concludes that no independent and lawfully obtained evidence establishes the probable cause necessary to support the issuance of a search warrant for the Defendant's house.
Ordered and adjudged that even with great deference afforded to the search warrant for the Defendant's house in this case, the probable cause affidavit did not provide a substantial basis for concluding that probable cause existed. Therefore, the motion to suppress evidence seized from the Defendant's house is granted.
With respect to the fact that Detective Pedraja testified that he smelled the odor of live marijuana plants as he stood outside the front door of Jardines' house, the trial court stated as follows in a footnote: "There was evidence that after the drug detection dog had alerted to the odor of a controlled substance, the officer also detected a smell of marijuana plants emanating from the front door. However, this information was only confirming what the detection dog had already revealed."
As explained above, a warrantless "sniff test" by a drug detection dog conducted at the front door of a private residence is impermissible under the Fourth Amendment. Thus, the trial court properly excluded the results of the "sniff test" from its review of the magistrate's probable cause determination. The remaining evidence consisted of the following: the unverified "crime stoppers" tip, the closed window blinds, and the constantly running air conditioner. As for Detective Pedraja's statement that he detected the odor of live marijuana plants as he stood outside the front door, we note that the trial court had the opportunity to observe Detective Pedraja's testimony first-hand at the suppression hearing. Further, the district court in Rabb addressed an identical situation and concluded as follows:
[B]ecause the chronology of the probable cause affidavit suggests that the dog alert to marijuana occurred prior to law enforcement's detection of its odor, we cannot assume that law enforcement detected the odor of marijuana before the dog alerted.... As such, this is not a case in which a law enforcement officer used his senses to detect something within his plain smell; rather, a law enforcement officer used enhanced, animal senses to detect something inside a home that he might not otherwise have detected.
Rabb, 920 So.2d at 1191. Based on our review of the present record, we conclude that the trial court's factual findings are supported by competent, substantial evidence and the trial court's ultimate ruling is supported in the law. The district court erred in reversing the suppression ruling.

V. CONCLUSION
"We have said that the Fourth Amendment draws `a firm line at the entrance to the house.' That line, we think, must be not only firm but also brightwhich requires clear specification of those methods of surveillance that require a warrant." Kyllo, 533 U.S. at 40, 121 S.Ct. 2038 (citation omitted) (quoting Payton, 445 U.S. at 590, 100 S.Ct. 1371). Given the special status accorded a citizen's home in Anglo-American jurisprudence, we hold that the warrantless "sniff test" that was conducted *56 at the front door of the residence in the present case was an unreasonable government intrusion into the sanctity of the home and violated the Fourth Amendment.
We quash the decision in Jardines and approve the result in Rabb.
It is so ordered.
PARIENTE, LEWIS, QUINCE, and LABARGA, JJ., concur.
LEWIS, J., specially concurs with an opinion, in which PARIENTE and LABARGA, JJ., concur.
POLSTON, J., dissents with an opinion, in which CANADY, C.J., concurs.
LEWIS, J., specially concurring.
The importance of freedom and liberty upon which this nation was founded is expressed in the Fourth Amendment and its protection of our homes from the government. This precious amendment reflects who we are as a people and reflects our values that protect every citizen from unreasonable intrusions by the government. "`At the very core' of the Fourth Amendment `stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion.'" Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). "Of all the places that can be searched by the police, one's home is the most sacrosanct, and receives the greatest Fourth Amendment protection." United States v. McGough, 412 F.3d 1232, 1236 (11th Cir.2005) (citing Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). In light of the elevated protections afforded to the privacy of one's home, the United States Supreme Court has held that "[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." Kyllo, 533 U.S. at 31, 121 S.Ct. 2038 (citing Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)). This Court has also expressed its reluctance to intrude on the privacy of one's home:
The Fourth Amendment establishes "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. amend. IV (emphasis added). Indeed, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), and "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961).
State v. Titus, 707 So.2d 706, 708 (Fla. 1998). In my view the primary emphasis in this case must fall on this concept of "home" and its sacred place under Fourth Amendment law.
First, the underlying basis for the search in question here, i.e., the anonymous tip, was insufficient to justify a search that would otherwise be in violation of the Fourth Amendment. In J.L. v. State, 727 So.2d 204 (Fla.1998), aff'd, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), this Court held that an anonymous tip cannot be a stand alone basis for reasonable suspicion. This Court made clear that when presented with an anonymous tip, "police must observe additional suspicious circumstances as a result of ... independent investigation" before the police can act on that tip. Id. at 207 (citing *57 Alabama v. White, 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)). In unanimously upholding this Court's decision in J.L., the United States Supreme Court also held that an uncorroborated anonymous tip is not a reliable justification for a Fourth Amendment search because, "[u]nlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated ... `an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'" Florida v. J.L., 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (citing Adams v. Williams, 407 U.S. 143, 146-47, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)) (quoting White, 496 U.S. at 329, 110 S.Ct. 2412).
Here, the "sniff test" was conducted based on nothing more than an unverifiable anonymous tip. See State v. Jardines, 9 So.3d 1, 2 (Fla. 3rd DCA 2008). Prior to entering the private porch of Jardines, the only purported "additional suspicious circumstance" referenced by the investigating officer was that he observed the air conditioning unit running continuously for fifteen minutes without interruption. See id. If a continuously running air conditioner is indicative of marijuana cultivation, then most Florida citizens and certainly all of my neighbors would be suspected drug dealers subject to intrusive searches by law enforcement. The elevation of such a ridiculous observation in the heat of Florida cannot serve as a basis for intrusion on the heightened expectation of privacy that one enjoys in one's home. Further, there was no evidence of any impending emergency or concern with regard to destruction of evidence. In light of the complete lack of any legitimate, articulable grounds for searching Jardines' home, the police officer, and his accompanying dog, should not have been on Jardines' porch "sniffing" under the front door in the first place.
Second, it is my view that the dog action here constituted a search of a home, in and of itself, and falls within the concept of a search under the Fourth Amendment. A reasonable expectation of privacy, a value of this society that has developed over many decades, applies not only to the physical, tangible items within a home, but also to the air and odors that may be within and may unintentionally escape from within. The scent of items cooking on a stove, the whiff of an air freshener, or even the foul smell associated with a ruptured sewage line are all intimate details of a home that are expected to remain private and unavailable to the public. We as Americans have an unwavering expectation that there will not be someone, or something, sniffing into every crack, crevice, window, or chimney of our homes. We especially do not expect strangers to bring dogs onto or into our private front porches to sniff under our front doors or any of the cracks or crevices of our homes. This protected interest of the expectation of privacy will be obliterated if a single individual, manipulating an animal, is permitted to make the final determination as to whether the government should enter into a private residence based upon an unverified, uncorroborated, anonymous tip. To sanction and approve turning the "dogs loose" on the homes of Florida citizens is the antithesis of freedom of private property and the expectation of privacy as we have known it and contrary to who we are as a free people.
The private residence is completely unlike the operation of a motor vehicle on highways, the transport of suitcases in public places, or the transport of packages in public transport. See City of Indianapolis v. Edmond, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000); United States v. *58 Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). The sanctity of the private residence, above all other expectations of privacy, has been a hallmark of this nation. A private residence is the most sacred of places under the Fourth Amendment, and an intrusion into that sacrosanct privacy commands the highest level of judicial scrutiny. As articulated by the Fourth District Court of Appeal, "An airport and a highway are unquestionably public places with little or no privacy, as much as a home is undoubtedly a private place characterized by its very privacy." State v. Rabb, 920 So.2d 1175, 1186 (Fla. 4th DCA 2006). Further, luggage located in a public airport, the interior of a vehicle driving on a public highway, and the contents of a package in public transport are "quite different from a house, not only in physical attributes, but also in the historical protection granted by law." Id. at 1184. A private home, on the other hand, is just that, a private, individual home.
While the expectation of privacy inherent within the private residence may not exist in or extend to common walkways, roadways, or other locations that are not within a private dwelling, that which is within the private residence is most assuredly protected. A hallway outside a college dormitory, for example, may not contain the same expectation of privacy as the front door and living room of a private home. We may discuss and debate the concept and extent of curtilage and the nexus with a private residence necessary to be considered part of a protected area. However, it is inescapable that the air and the content of the air within the private home is inextricably interwoven as part of the protected zone of privacy to which the expectation of privacy attaches. This air is inextricably interwoven in the constitutional context as part of the sanctity of a Florida private home and the private lives of our citizens protected therein. The home and the air within the home are expected and intended to remain within the sanctity of the home with no intent, design, or expectation that they become public or exposed beyond the walls of the home. While one of great wealth with a newly constructed air-tight private home surely has an expectation of privacy of the home and of the air constituted therein, his less wealthy Florida neighbor should not be denied the same fundamental protection simply because his less substantially constructed private home may have a crack or crevice through which air or odors may unintentionally and unexpectedly escape to its curtilage. Allowing a dog to sniff the air and odors that escape from within a home under a door is tantamount to physical entry into that home. Under the view articulated by the dissent, a dog entering a home through the front door, a window, or any other large crack or crevice would not amount to an unconstitutional search. Surely we cannot permit the sanctity of the privacy of our homes to be measured by the size of the cracks or crevices from which air may escape.
My esteemed colleague in dissent incorrectly asserts that a recognition of the right of Floridians to be free from unauthorized dog sniffs in their homes is a violation of United States Supreme Court precedent. Specifically, my colleague relies on four inapplicable United States Supreme Court decisions that approve the validity of dog sniffs in limited situations outside the home, each of which is so clearly distinguishable from the facts presently before the Court. In United States v. Place, 462 U.S. 696, 697-98, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the narrow question before the United States Supreme Court was whether the Fourth Amendment prohibits law enforcement authorities from temporarily detaining personal luggage *59 outside the home in a public place for exposure to a trained narcotics detection dog on the basis of reasonable suspicion that the luggage contains narcotics. In United States v. Jacobsen, 466 U.S. 109, 111, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), the Supreme Court simply determined whether police needed to obtain a warrant before searching a damaged package in a public location, visibly leaking a white powdery substance, while in the possession of a private freight carrier. In City of Indianapolis v. Edmond, 531 U.S. 32, 34, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), the United Supreme Court considered in a public place the "constitutionality of a highway checkpoint program whose primary purpose is the discovery and interdiction of illegal narcotics." (Emphasis supplied.) Finally, in Illinois v. Caballes, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005), the question before the Court was in a public place or roadway "[w]hether the Fourth Amendment requires reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop." (Emphasis supplied.) None of these decisions, or any other decision of the United States Supreme Court, has ever addressed whether the Fourth Amendment requires reasonable, articulable suspicion to justify a dog sniff under the front door of a single family private residence. Accordingly, contrary to the assertion of the dissent, there is no "binding United States Supreme Court precedent" to violate. Dissenting op. at 61.
The core of the dissent's opinion fails to accommodate and is built upon a lack of appreciation for the elevated status that a protected private home has in both this Court and the United States Supreme Court. The dissent asserts that "[b]ecause the dog sniff is only capable of detecting contraband, it is only capable of detecting that which is not protected by the Fourth Amendment." Dissenting op. at 70. Perhaps this statement holds true for luggage in a public airport, a package in a public transport and distribution facility, or in a vehicle on a public roadway, but as discussed above, there are many intimate details associated with the content and odors that may flow from the cracks and crevices of a home. Each of the aforementioned items carries an expectation of privacy that is in no way as great as the expectation of privacy that exists in an individual's home. The dissent fails to accommodate and recognize the increased expectation of privacy that exists in one's home, an expectation that all courts have recognized as greater than any other. To dismiss the critical difference between this case, involving a dog sniff of an individual's home, and the four other cases relied on by the dissent dangerously undermines the most sacrosanct place that is vulnerable to intrusion by the government, our homes.
Further, the complete absence of any United States Supreme Court precedent on dog sniffs of the cracks and crevices of a private home does not in any way preclude this Court from declaring such a search unconstitutional; rather, it empowers this Court to do so. Although it is true that article 1, section 12 of the Florida Constitution requires this Court to "follow the interpretations of the United States Supreme Court with respect to the Fourth Amendment and provide to Florida citizens no greater protection than those interpretations," Soca v. State, 673 So.2d 24, 27 (Fla.1996), it is also true that in the absence of a controlling United States Supreme Court decision, Florida courts are still not prohibited from providing our citizens with a higher standard of protection from governmental intrusion than that afforded by the Federal Constitution. See id. at 26-27 (citing State v. Lavazzoli, 434 So.2d 321, 323 (Fla.1983)).
*60 Third, the lack of a uniform system of training and certification for drug detection canines makes it unconstitutionally difficult for a defendant to challenge a dog sniff after circumstances such as these have occurred. As articulated by the Second District Court of Appeal in Matheson v. State, 870 So.2d 8, 14 (Fla. 2d DCA 2003):
[C]onditioning and certification programs vary widely in their methods, elements, and tolerances of failure. Consider, for example, the United States Customs Service regime:
The Customs Service puts its dog and handler teams through a rigorous twelve-week training course, where only half of the canines complete the training. Customs Service dogs are trained to disregard potential distractions such as food, harmless drugs, and residual scents. Agents present distractions during training, and reward the dogs when those diversions are ignored. The teams must complete a certification exam in which the dog and handler must detect marijuana, hashish, heroin, and cocaine in a variety of environments. This exam and the following annual recertifications must be completed perfectly, with no false alerts and no missed drugs. If a dog and handler team erroneously alerts, the team must undergo remedial training. If the team fails again, the team is disbanded, and the dog is permanently relieved from duty.
[Robert C. Bird, An Examination of the Training and Reliability of the Narcotics Detection Dog, 85 Ky. L.J. 405, 410-11 (1997)]. In contrast, the testimony below disclosed that Razor and his handler had undergone just one initial thirty-day training course and one week-long annual recertification course. In neither course was Razor conditioned to refrain from alerting to residual odors. Whereas the Customs Service will certify only dogs who achieve and maintain a perfect record, Razor's certification program accepted a seventy percent proficiency. These disparities demonstrate that simply characterizing a dog as "trained" and "certified" imparts scant information about what the dog has been conditioned to do or not to do, or how successfully.

Finally, dogs themselves vary in their abilities to accept, retain, or abide by their conditioning in widely varying environments and circumstances. "[E]ach dog's performance is affected differently by working conditions and its respective attention span. There is also the possibility that the handler may unintentionally or otherwise prompt his dog to alert." [Max A. Hansen, United States v. Solis: Have the Government's Supersniffers Come Down With a Case of Constitutional Nasal Congestion?, 13 San Diego L.Rev. 410, 416 (1976) ]. The Customs Service monitors its dogs' performance in the field. Recognizing that a dog's ability can change over time, it maintains records for only thirty to sixty days, then discards them because older records are not probative of the dog's skills. Bird, 85 Ky. L.J. at 415. The Hillsborough County Sheriff's Office maintained no records of Razor's performance, and his handler had not kept track.
(Emphasis supplied.) Due to the clear lack of uniformity in certification for drug detection dogs, the Second District in Matheson held that the fact that a dog is trained and certified, standing alone, is insufficient to establish probable cause to search a home based exclusively on the dog's alert. See id. I agree with the sound reasoning articulated in Matheson. The complete lack of a uniform or standardized *61 system of certifying drug detection canines renders it unduly burdensome for a defendant to challenge the validity of an intrusive dog sniff into a private home that results in an arrest. Forcing finders of fact to rely exclusively on the assertions of police officers that their own dogs are properly trained is inconsistent with our time honored understanding of due process. Here, the probable cause affidavit simply notes that the drug detection dog received "weekly maintenance training," but does not at all indicate what that training entails or how extensive that training may be. See Jardines, 9 So.3d at 2. This statement, void of any specificity or substance, cannot serve as an irrefutable declaration that establishes a dog's ability to detect drugs.
Finally, the dissent asserts that "distinguishing this case from the United States Supreme Court's dog sniff cases based upon the level of embarrassment the majority presumes to be present here is improper." Dissenting op. at 69-70. This case involves an unconstitutional search of a private residence by dogs without any verifiable training, the underlying premise of which does not pass constitutional muster. The level of embarrassment suffered by the party that has been searched is not a significant part of the constitutional analysis and does not in any way negate the constitutional invalidity of the search.
We cannot permit the protections of the Fourth Amendment, fragile as they may be, to be decimated piece by piece and little by little until they become mere vestiges of our past. All courts recognize that the home and curtilage of a home are protected and the protection is determined by factors with regard to whether an individual reasonably may expect that the area in question should receive the same status as the home itself. The cracks and crevices around our front doors or windows that may permit air to unintentionally escape are surely in a reasonably free society areas protected by our most cherished document.
PARIENTE and LABARGA, JJ., concur.
POLSTON, J., dissenting.
Because the majority's decision violates binding United States Supreme Court precedent, I respectfully dissent.
Despite the majority's focus upon multiple officers and the supposed time involved in surveillance and in execution of the search warrant,[12] it is undisputed that one dog and two officers were lawfully and briefly present near the front door of Jardines' residence when the dog sniff at issue in this case took place. And despite statements about privacy interests in items and odors within and escaping from a home,[13] the United States Supreme Court has ruled that there are no legitimate privacy interests in contraband under the Fourth Amendment. See Illinois v. Caballes, 543 U.S. 405, 408, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) ("Official conduct that does not `compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment. We have held that any interest in possessing contraband cannot be deemed `legitimate.'") (quoting United States v. Jacobsen, 466 U.S. 109, 123, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)).
Contrary to the majority's position, the United States Supreme Court has ruled that a dog sniff is not a search within the meaning of the Fourth Amendment because a dog sniff only reveals contraband in which there is no legitimate privacy *62 interest. See id. (holding that dog sniff of vehicle was not a search within meaning of Fourth Amendment and explaining that "governmental conduct that only reveals the possession of contraband `compromises no legitimate privacy interest.'") (quoting Jacobsen, 466 U.S. at 123, 104 S.Ct. 1652); City of Indianapolis v. Edmond, 531 U.S. 32, 40, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) ("Just as in United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), an exterior sniff of an automobile does not require entry into the car and is not designed to disclose any information other than the presence or absence of narcotics."); Jacobsen, 466 U.S. at 124 n. 24, 104 S.Ct. 1652 ("[T]he reason [the dog sniff in Place] did not intrude upon any legitimate privacy interest was that the governmental conduct could reveal nothing about noncontraband items."); Place, 462 U.S. at 707, 103 S.Ct. 2637 ("[T]he sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited."). Accordingly, the dog sniff involved in this case, which occurred while law enforcement was lawfully present at the front door, cannot be considered a search in violation of the Fourth Amendment.

I. BACKGROUND
On November 3, 2006, law enforcement received an anonymous tip identifying Jardines' home as a place used to grow marijuana. On December 5, 2006, law enforcement set up surveillance of Jardines' residence. After Detective Pedraja of the Miami-Dade Police Department had conducted surveillance for fifteen minutes, Detective Bartlet of the Miami-Dade Police Department arrived with a drug-detection dog, Franky. Detective Bartlet and Franky, who was on a six-foot leash, approached the front porch of the residence with Detective Pedraja behind them. Franky began tracking an odor and traced it to the front door, where Franky assumed a sitting position after sniffing at the base of the door, thereby alerting to the scent of marijuana. Detective Bartlet and Franky immediately returned to Detective Bartlet's vehicle. Thereafter, Detective Pedraja smelled the scent of live marijuana at the front door. Detective Pedraja then knocked on the front door, received no response, and noticed that Jardines' air conditioner was running excessively.[14]
Based upon this information, a search warrant was obtained, and Jardines' residence was searched. The search resulted in the seizure of live marijuana plants and equipment used to grow those plants. Jardines was charged with trafficking in cannabis and grand theft.
Jardines moved to suppress the seized evidence, arguing that Franky's sniff was an unconstitutional search and that Officer Pedraja's smell of marijuana was tainted by Franky's prior sniff. The trial court granted Jardines' motion. On appeal, *63 however, the Third District reversed, reasoning as follows:
[F]irst, a canine sniff is not a Fourth Amendment search; second, the officer and the dog were lawfully present at the defendant's front door; and third, the evidence seized would inevitably have been discovered.
State v. Jardines, 9 So.3d 1, 4 (Fla. 3d DCA 2008). In holding that a dog sniff does not constitute a search under the Fourth Amendment, the Third District certified conflict with the Fourth District's decision in State v. Rabb, 920 So.2d 1175 (Fla. 4th DCA 2006).

II. ANALYSIS
The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The similar right contained in the Florida Constitution is "construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court." Art. I, § 12, Fla. Const. Therefore, this Court's jurisprudence in this area must conform to the United States Supreme Court's precedent interpreting the Fourth Amendment.
In this case, it is undisputed that law enforcement was lawfully present at Jardines' front door. While the Fourth Amendment certainly protects "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion," Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961), the publicly accessible area around the front door of the home is not accorded the same degree of Fourth Amendment protection. See, e.g., United States v. French, 291 F.3d 945, 953 (7th Cir.2002) ("The route which any visitor or delivery man would use is not private in the Fourth Amendment sense ....") (quoting United States v. Evans, 27 F.3d 1219, 1229 (7th Cir.1994)); United States v. Hersh, 464 F.2d 228, 230 (9th Cir.1972) ("Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's `castle' with the honest intent of asking questions of the occupant thereofwhether the questioner be a pollster, a salesman, or an officer of the law.") (quoting Davis v. United States, 327 F.2d 301, 303 (9th Cir. 1964)). In fact, the majority acknowledges that "one does not harbor an expectation of privacy on a front porch where salesmen or visitors may appear at any time." Majority op. at 46 (quoting State v. Morsman, 394 So.2d 408, 409 (Fla.1981)).
Furthermore, there are no allegations here that an officer's detection of the scent of marijuana while lawfully present at Jardines' front door would have violated the Fourth Amendment. There are no such allegations because "the police may see what may be seen `from a public vantage point where [they have] a right to be.'" Florida v. Riley, 488 U.S. 445, 449, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (quoting California v. Ciraolo, 476 U.S. 207, 213, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986)) (reversing a decision of this Court that had factually distinguished a United States Supreme Court decision to hold that a helicopter's flight at 400 feet over property near a home violated the Fourth Amendment); see also United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) (search warrant properly based in part upon investigators' smell of odor when they walked in front of home). Or, as the Ninth Circuit plainly put it with *64 regard to the sense of smell, one does not have "a reasonable expectation of privacy from drug agents with inquisitive nostrils." United States v. Johnston, 497 F.2d 397, 398 (9th Cir.1974); see also 1 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(c), at 575-77 (4th ed. 2004) ("[I]f police utilize `normal means of access to and egress from the house' for some legitimate purpose, such as to make inquiries of the occupant, to serve a subpoena, or to introduce an undercover agent into the activities occurring there, it is not a Fourth Amendment search for the police to see or hear or smell from that vantage point what is happening inside the dwelling.") (footnotes omitted) (quoting Lorenzana v. Superior Court, 9 Cal.3d 626, 108 Cal.Rptr. 585, 511 P.2d 33, 37 (1973)); United States v. Angelos, 433 F.3d 738, 747 (10th Cir. 2006) (applying the "plain smell" doctrine).
Accordingly, the only remaining question at issue in this case is whether a law enforcement officer, who is lawfully present at the front door of a private residence, may employ a dog sniff at that front door. Based upon binding United States Supreme Court precedent, the answer is quite clearly yes.
The United States Supreme Court has explained that "a Fourth Amendment search does not occureven when the explicitly protected location of a house is concernedunless `the individual manifested a subjective expectation of privacy in the object of the challenged search,' and `society [is] willing to recognize that expectation as reasonable.'" Kyllo v. United States, 533 U.S. 27, 33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting Ciraolo, 476 U.S. at 211, 106 S.Ct. 1809) (alteration in original).
Additionally, and of great importance here, the United States Supreme Court has held that a dog sniff does not constitute a search within the meaning of the Fourth Amendment because it only reveals contraband and there is no legitimate privacy interest in contraband that society is willing to recognize as reasonable. See Caballes, 543 U.S. 405, 125 S.Ct. 834; Edmond, 531 U.S. 32, 121 S.Ct. 447; Place, 462 U.S. 696, 103 S.Ct. 2637; see also Jacobsen, 466 U.S. 109, 104 S.Ct. 1652.
First, in Place, 462 U.S. at 707, 103 S.Ct. 2637, the United States Supreme Court stated the following regarding the unique and very limited nature of a dog sniff when holding that a dog sniff of a passenger's luggage in an airport was not a search under the Fourth Amendment:
We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment. Id., at 13 [97 S.Ct. 2476]. A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.
In these respects, the canine sniff is sui generis. We are aware of no other investigative procedure that is so limited *65 both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here exposure of respondent's luggage, which was located in a public place, to a trained caninedid not constitute a "search" within the meaning of the Fourth Amendment.
Then, the United States Supreme Court further explained its decision in Place when holding in Jacobsen, 466 U.S. at 123, 104 S.Ct. 1652, that a chemical test of a package did not constitute a search because "governmental conduct that can reveal whether a substance is cocaine, and no other arguably `private' fact, compromises no legitimate privacy interest." The Court stated that this holding was "dictated" by Place because, "as in Place, the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment." Jacobsen, 466 U.S. at 124, 104 S.Ct. 1652. The Court explained that "the reason [the dog sniff in Place] did not intrude upon any legitimate privacy interest was that the governmental conduct could reveal nothing about noncontraband items." Id. at 124 n. 24, 103 S.Ct. 2637.
Thereafter, in Edmond, 531 U.S. at 40, 121 S.Ct. 447, the United States Supreme Court reaffirmed Place when briefly discussing why a dog sniff of the exterior of a car stopped at a checkpoint did not constitute a search:
It is well established that a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment. See, e.g., Sitz, [496 U.S.] at 450 [110 S.Ct. 2481]. The fact that officers walk a narcotics-detection dog around the exterior of each car at the Indianapolis checkpoints does not transform the seizure into a search. See United States v. Place, 462 U.S. 696, 707 [103 S.Ct. 2637, 77 L.Ed.2d 110] (1983). Just as in Place, an exterior sniff of an automobile does not require entry into the car and is not designed to disclose any information other than the presence or absence of narcotics. See ibid. Like the dog sniff in Place, a sniff by a dog that simply walks around a car is "much less intrusive than a typical search." Ibid. Cf. United States v. Turpin, 920 F.2d 1377, 1385 (C.A.8 1990).
Finally, in Caballes, 543 U.S. at 408-09, 125 S.Ct. 834, the United States Supreme Court again reaffirmed Place as well as Jacobsen when holding that a dog sniff of the exterior of a vehicle during a lawful traffic stop was not a search because the sniff only revealed contraband in which there is no legitimate privacy interest:
[C]onducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner, unless the dog sniff itself infringed respondent's constitutionally protected interest in privacy. Our cases hold that it did not.
Official conduct that does not "compromise any legitimate interest in privacy" is not a search subject to the Fourth Amendment. Jacobsen, 466 U.S., at 123 [104 S.Ct. 1652]. We have held that any interest in possessing contraband cannot be deemed "legitimate," and thus, governmental conduct that only reveals the possession of contraband "compromises no legitimate privacy interest." Ibid. This is because the expectation "that certain facts will not come to the attention of the authorities" is not the same as an interest in "privacy that society is prepared to consider reasonable." Id., *66 at 122 [104 S.Ct. 1652] (punctuation omitted). In United States v. Place, 462 U.S. 696 [103 S.Ct. 2637, 77 L.Ed.2d 110] (1983), we treated a canine sniff by a well-trained narcotics-detection dog as "sui generis" because it "discloses only the presence or absence of narcotics, a contraband item." Id., at 707 [103 S.Ct. 2637] see also Indianapolis v. Edmond, 531 U.S. 32, 40 [121 S.Ct. 447, 148 L.Ed.2d 333] (2000)....
Accordingly, the use of a well-trained narcotics-detection dogone that "does not expose noncontraband items that otherwise would remain hidden from public view," Place, 462 U.S., at 707 [103 S.Ct. 2637]during a lawful traffic stop, generally does not implicate legitimate privacy interests. In this case, the dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation. Any intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement.
In Caballes, the Court also explained why its dog sniff decisions are consistent with its thermal-imaging decision, namely becauseunlike a thermal imaging devicea dog sniff only reveals contraband:
This conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search. Kyllo v. United States, 533 U.S. 27 [121 S.Ct. 2038, 150 L.Ed.2d 94] (2001). Critical to that decision was the fact that the device was capable of detecting lawful activityin that case, intimate details in a home, such as "at what hour each night the lady of the house takes her daily sauna and bath." Id., at 38 [121 S.Ct. 2038]. The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car. A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.
To summarize, in Place, Jacobsen, Edmond, and Caballes, the United States Supreme Court held that dog sniffs are not searches within the meaning of the Fourth Amendment because they only detect contraband and there is no legitimate privacy interest in contraband that society recognizes as reasonable. A vast majority of federal[15] and state[16] courts have interpreted *68 the United States Supreme Court's decisions as holding that dog sniffs are not searches under the Fourth Amendment, even in the context of private residences.[17]
In this case, Franky the dog was lawfully present at Jardines' front door when he alerted to the presence of marijuana. And because, under the binding United States Supreme Court precedent described above, a dog sniff only reveals contraband in which there is no legitimate privacy interest, Franky's sniff cannot be considered a search violating the Fourth Amendment.
The majority concludes that the United States Supreme Court's precedent regarding dog sniffs does not apply here because those dog sniff cases did not involve dog sniffs of a home. See majority op. at 44. However, the United States Supreme Court did not limit its reasoning regarding dogs sniffs to locations or objects unrelated to the home. There is no language in Place, Jacobsen, Edmond, or Caballes that indicates the reasoning that dog sniffs are not searches (because they only reveal contraband in which there is no legitimate expectation of privacy) would change if the cases involved private residences. And, most importantly, the United States Supreme Court issued Caballes after its ruling *69 in Kyllo, a case involving a home. Caballes specifically distinguishes Kyllo, not based upon the object sniffed, but by explaining that, unlike the thermal imaging device involved in Kyllo, a dog sniff only reveals contraband. See Caballes, 543 U.S. at 409-10, 125 S.Ct. 834. Therefore, the very limited and unique type of intrusion involved in a dog sniff is the dispositive distinction under United States Supreme Court precedent, not whether the object sniffed is luggage, an automobile, or a home. Accordingly, the majority's holding based upon the object sniffed is contrary to the United States Supreme Court's precedent.[18]Kyllo is the precedent that is inapplicable to this dog sniff case, not the United States Supreme Court's cases that actually involve dog sniffs.
In addition, the majority distinguishes the binding precedent regarding dog sniffs based upon what it terms "public opprobrium, humiliation and embarrassment." Majority op. at 36, 45, 48, 49-50. By focusing upon the multiple officers and the supposed time involved in surveillance and the execution of the search warrant, the majority concludes that the sniff here was more intensive and involved a higher level of embarrassment than the sniffs involved in Place, Edmond, and Caballes. See majority op. at 46-47, 48-49. However, Place, Edmond, and Caballes all involved law enforcement activity by multiple officers. See Place, 462 U.S. at 698-99, 103 S.Ct. 2637 (describing law enforcement activity by multiple officers in Miami and two DEA agents in New York); Edmond, 531 U.S. at 34-36, 121 S.Ct. 447 (describing law enforcement activity by approximately thirty officers of the Indianapolis Police Department); Caballes, 543 U.S. at 406, 125 S.Ct. 834 (describing law enforcement activity by two officers). And although the majority states that the law enforcement activity in this case "lasted for hours," majority op. at 36, 48, there is no evidence in the record to support that supposition. To the contrary, when asked during the suppression hearing how long he and the dog "remain[ed] on the scene that day," Detective Bartlet responded, "That was a day we were doing multiple operations and I had probably two other people waiting for the dog. So I couldn't have been there much more than five or ten minutes, just enough to grab the information on the flash drive, hand it over and leave." The other specific testimony regarding time in the record is Detective Pedraja's testimony during the suppression hearing explaining that he conducted surveillance for fifteen minutes before approaching the residence with Detective Bartlet and the dog and that it was "approximately 15 to 20 minutes from the time that [he] went to the front door, was standing at the threshold, went to the front door and then came back." Furthermore, as explained above, there are no allegations here that the multiple officers near Jardines' residence violated the Fourth Amendment, regardless of the level of "public opprobrium, humiliation, and embarrassment" that the presence of these officers may have caused Jardines. Therefore, distinguishing this case from the United States Supreme Court's dog sniff cases based upon the level of embarrassment *70 the majority presumes to be present here is improper.
Finally, it is critical to note that the majority's (and the special concurrence's) assumption that Jardines had a reasonable expectation that the smell of marijuana coming from his residence would remain private is contrary to the explicit pronouncements in Jacobsen and Caballes that the possessor of contraband has no legitimate expectation of privacy in that contraband. See United States v. Colyer, 878 F.2d 469, 475 (D.C.Cir.1989) ("[T]he Supreme Court's analyses in Place and Jacobsen indicate that a possessor of contraband can maintain no legitimate expectation that its presence will not be revealed."). Indeed, the fact that one has no reasonable expectation of privacy in contraband is precisely why a dog sniff is not a search under the United States Supreme Court's precedent interpreting the Fourth Amendment. Because the dog sniff is only capable of detecting contraband, it is only capable of detecting that which is not protected by the Fourth Amendment. See Caballes, 543 U.S. at 408, 125 S.Ct. 834 ("We have held that any interest in possessing contraband cannot be deemed `legitimate,' and thus, governmental conduct that only reveals the possession of contraband `compromises no legitimate privacy interest.'") (quoting Jacobsen, 466 U.S. at 123, 104 S.Ct. 1652).

III. CONCLUSION
As held by United States Supreme Court, a dog sniff is not a search within the meaning of the Fourth Amendment because it only reveals contraband and there is no legitimate expectation of privacy in contraband that society is willing to recognize as reasonable. Given this binding precedent, Franky's sniff, while lawfully present at Jardines' front door, cannot be considered a search under the Fourth Amendment. Therefore, I would approve the Third District's decision in Jardines and disapprove the Fourth District's contrary decision in Rabb.
Accordingly, I respectfully dissent.
CANADY, C.J., concurs.
NOTES
[1] The affidavit that Detective Pedraja submitted to the magistrate provided as follows, in relevant part:

"Your Affiant's" reasons for the belief that "The Premises" is being used as [a marijuana hydroponics grow lab] and that "The Property [consisting of marijuana and the equipment to grow it]" listed above is being concealed and stored at "The Premises" is as follows:
On November 3, 2006, "Your Affiant" detective William Pedraja, # 1268, received information from a crime stoppers tip that marijuana was being grown at the described residence.
On December 5, 2006, "Your Affiant" conducted surveillance at the residence and observed no vehicles in the driveway. "Your Affiant" also observed windows with the blinds closed. "Your Affiant" and Detective Doug Bartelt with K-9 drug detection dog "FRANKY" approached "The Premises" in an attempt to obtain a consent to search. While at front door [sic], "Your Affiant" detected the smell of live marijuana plants emanating from the front door of "The Premises." The scent of live marijuana is a unique and distinctive odor unlike any other odor. Additionally, K-9 drug detection dog "FRANKY" did alert to the odor of one of the controlled substances he is trained to detect. "Your Affiant," in an attempt to obtain a written consent to search, knocked on the front door of "The Premises" without response. "Your Affiant" also heard an air conditioning unit on the west side of the residence continuously running without recycling. The combination of these factors is indicative of marijuana cultivation.
Based upon the positive alert by narcotics detector dog "FRANKY" to the odor of one or more of the controlled substances that she is trained to detect and "FRANKY" [sic] substantial training, certification, and past reliability in the field in detecting those controlled substances, it is reasonable to believe that one or more of those controlled substances are present within the area alerted to by "FRANKY." Narcotics Canine handler, Detective Bartelt, Badge number 4444, has been a police officer with the Miami-Dade Police Department for nine years. He has been assigned to the Narcotics Bureau for six years and has been a canine handler since May 2004. In the period of time he has been with the Department, he has participated in over six hundred controlled substances searches. He has attended the following training and received certification as a canine handler....
Since becoming a team, Detective Bartelt and narcotics detector canine "FRANKY" have received weekly maintenance training.... Narcotics detector canine "FRANKY" is trained to detect the odor of narcotics emanating from the following controlled substances to wit: marijuana.... To date, narcotics detector canine "FRANKY" has worked approximately 656 narcotics detection tasks in the field. He has positively alerted to the odor of narcotics approximately 399 times. "FRANKY'S" positive alerts have resulted in the detection and seizure of approximately 13,008 grams of cocaine, 2,638 grams of heroin, 180 grams of methamphetamine, 936,614 grams of marijuana, both processed ready for sale and/or live growing marijuana.
WHEREFORE, Affiant prays that a Search Warrant be issued ... to search "The Premises" above-described....
[2] The Fourth District Court of Appeal in State v. Rabb, 920 So.2d 1175 (Fla. 4th DCA 2006), affirmed the trial court's suppression of illicit drugs (marijuana found growing in Rabb's house) following a warrantless "sniff test" by a drug detection dog at the front door of Rabb's home. The district court based its ruling on Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), reasoning as follows:

[Our logic here] is no different than that expressed in Kyllo, one of the recent pronouncements by the United States Supreme Court on law enforcement searches of houses. The use of the dog, like the use of a thermal imager, allowed law enforcement to use sense-enhancing technology to intrude into the constitutionally-protected area of Rabb's house, which is reasonably considered a search violative of Rabb's expectation of privacy in his retreat. Likewise, it is of no importance that a dog sniff provides limited information regarding only the presence or absence of contraband, because as in Kyllo, the quality or quantity of information obtained through the search is not the feared injury. Rather, it is the fact that law enforcement endeavored to obtain the information from inside the house at all, or in this case, the fact that a dog's sense of smell crossed the "firm line" of Fourth Amendment protection at the door of Rabb's house. Because the smell of marijuana had its source in Rabb's house, it was an "intimate detail" of that house, no less so than the ambient temperature inside Kyllo's house. Until the United States Supreme Court indicates otherwise, therefore, we are bound to conclude that the use of a dog sniff to detect contraband inside a house does not pass constitutional muster. The dog sniff at the house in this case constitutes an illegal search.
Rabb, 920 So.2d at 1184.
[3] We note that the First District Court of Appeal in Stabler v. State, 990 So.2d 1258 (Fla. 1st DCA 2008), also certified conflict with Rabb. In Stabler, the district court held that a dog "sniff test" conducted at an apartment door that opens onto a common area accessible to the general public does not constitute a "search" for Fourth Amendment purposes. As noted herein, Stabler is distinguishable from Rabb in that Stabler involved a "sniff test" conducted at an apartment or other temporary dwelling, not a "sniff test" conducted at a private residence. See infra note 10.
[4] The comparable provision of the Florida Constitution is contained in article I, section 12, which further provides: "This right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court." Art. I, § 12, Fla. Const.
[5] Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (addressing the issue of whether police, without a warrant, can listen to and record one end of a telephone conversation in a public phone booth via an electronic listening and recording device attached to the outside surface of the booth).
[6] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (addressing the issue of whether police, based on an evidentiary showing of less than probable cause, can temporarily seize and search a person).
[7] There is little doubt, however, that a dragnet-style sweep of an entire residential neighborhood or of a multi-unit residential dwelling, conducted without any individualized suspicion of wrongdoing, would be impermissible. Cf. City of Indianapolis v. Edmond, 531 U.S. at 41, 121 S.Ct. 447 ("We have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing. Rather, our checkpoint cases have recognized only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion.").
[8] Compare State v. Rabb, 920 So.2d 1175 (Fla. 4th DCA 2006) (holding that a dog "sniff test" outside a private residence is a "search" within the meaning of the Fourth Amendment); with People v. Jones, 279 Mich.App. 86, 755 N.W.2d 224 (2008) (holding that a dog "sniff test" outside a private residence is not a "search" within the meaning of the Fourth Amendment); and Porter v. State, 93 S.W.3d 342 (Tex.App.2002) (holding that a dog "sniff test" outside a private residence is not a "search" within the meaning of the Fourth Amendment); and Rodriguez v. State, 106 S.W.3d 224 (Tex.App.2003) (holding that a dog "sniff test" outside a private residence is not a "search" within the meaning of the Fourth Amendment).
[9] See United States v. Tarazon-Silva, 960 F.Supp. 1152 (W.D.Tex. 1997) (holding that a dog "sniff test" outside a private residence is not a "search" within the meaning of the Fourth Amendment).
[10] Compare State v. Ortiz, 257 Neb. 784, 600 N.W.2d 805 (1999) (holding that a dog "sniff test" outside an apartment is a "search" within the meaning of the Fourth Amendment); with Fitzgerald v. State, 384 Md. 484, 864 A.2d 1006 (2004) (holding that a dog "sniff test" outside an apartment is not a "search" within the meaning of the Fourth Amendment); and Stabler v. State, 990 So.2d 1258 (Fla. 1st DCA 2008) (holding that a dog "sniff test" outside an apartment is not a "search" within the meaning of the Fourth Amendment); and Nelson v. State, 867 So.2d 534 (Fla. 5th DCA 2004) (indicating that a dog "sniff test" outside a hotel room is not a "search" within the meaning of the Fourth Amendment); and People v. Dunn, 77 N.Y.2d 19, 563 N.Y.S.2d 388, 564 N.E.2d 1054 (1990) (holding that a dog "sniff test" outside an apartment is not a "search" within the meaning of the Fourth Amendment, but is a search within the meaning of the state constitution).
[11] Compare United States v. Whitehead, 849 F.2d 849 (4th Cir.1988) (holding that a dog "sniff test" outside a railway sleeper compartment is a "search" within the meaning of the Fourth Amendment); and United States v. Thomas, 757 F.2d 1359 (2d Cir.1985) (holding that a dog "sniff test" outside an apartment is a "search" within the meaning of the Fourth Amendment); with United States v. Brock, 417 F.3d 692 (7th Cir.2005) (holding that a dog "sniff test" outside a locked bedroom is not a "search" within the meaning of the Fourth Amendment); and United States v. Roby, 122 F.3d 1120 (8th Cir.1997) (indicating that a dog "sniff test" outside a hotel room is not a "search" within the meaning of the Fourth Amendment); and United States v. Colyer, 878 F.2d 469 (D.C.Cir.1989) (holding that a dog "sniff test" outside a railway sleeper compartment is not a "search" within the meaning of the Fourth Amendment); and United States v. Broadway, 580 F.Supp.2d at 1179 (D.Colo. 2008) (holding that a dog "sniff test" outside an apartment is not a "search" within the meaning of the Fourth Amendment).
[12] See majority op. at 35-36, 46, 47-49.
[13] See special concurrence at 57.
[14] According to testimony presented at the suppression hearing, Detective Pedraja remained behind Franky and Detective Bartlet while the dog sniff occurred. And based upon the facts described in the State's response to Jardines' motion to suppress, Sergeant Ramirez and Detective Donnelly established perimeter positions during the dog sniff with agents of the Drug Enforcement Administration (DEA) as a support unit. The State's response also explains that DEA continued surveillance after the sniff while Detective Pedraja obtained a search warrant. Detective Pedraja testified at the suppression hearing that he got in his vehicle and "drove to a location close by" to prepare the warrant. Furthermore, Jardines' motion to suppress states that DEA agents and members of the Miami-Dade Police Department executed the search warrant "[a]bout an hour later."
[15] See United States v. Scott, 610 F.3d 1009, 1016 (8th Cir.2010) (holding that dog sniff of apartment's front door from common hallway was not a search under the Fourth Amendment and rejecting argument that Kyllo should be extended to dog sniffs, explaining that "the Supreme Court rejected such an interpretation of Kyllo in Caballes"); United States v. Brock, 417 F.3d 692, 696 (7th Cir. 2005) ("[W]e hold that the dog sniff inside Brock's residence [specifically at the locked door of bedroom rented by Brock] was not a Fourth Amendment search because it detected only the presence of contraband and did not provide any information about lawful activity over which Brock had a legitimate expectation of privacy."); United States v. Reed, 141 F.3d 644, 649-50 (6th Cir. 1998) (holding that dog sniff of flat was not a search when dog was lawfully present in the flat and rejecting argument that Place only applies to "public sniffs"); United States v. Broadway, 580 F.Supp.2d 1179, 1193 (D.Colo.2008) (rejecting the applicability of Kyllo, holding a dog sniff of apartment from hallway and from walkway outside window was not a search under the Fourth Amendment, and explaining that "as long as a canine unit is lawfully present when a drug sniff occurs, the sniff is not a search"); United States v. Cota-Lopez, 358 F.Supp.2d 579, 592 (W.D.Tex.2002) (rejecting argument that the heightened privacy interest makes dog sniff of front door at private residence intrusive, explaining "Place and Jacobsen compel the conclusion that a canine sniff capable of detecting only the presence or absence of contraband is not a search within the meaning of the Fourth Amendment"), aff'd, 104 Fed.Appx. 931 (5th Cir.2004); United States v. Meindl, 83 F.Supp.2d 1207, 1216-17 (D.Kan. 1999) (rejecting argument that plain view/smell exception was inapplicable because the dog sniff occurred in a home rather than a public place); United States v. Tarazon-Silva, 960 F.Supp. 1152, 1162-63 (W.D.Tex. 1997) (holding dog sniff of the outside of a residence and alert at a dryer vent was not a search when dog and officer had the right to be positioned alongside residence), aff'd, 166 F.3d 341 (5th Cir.1998); see also United States v. Roby, 122 F.3d 1120, 1124-25 (8th Cir.1997) (holding that a dog sniff in hallway outside hotel room was not a search); United States v. Lingenfelter, 997 F.2d 632, 638 (9th Cir.1993) (holding that dog sniff of warehouse was not a search because defendant "could have no legitimate expectation that a narcotics canine would not detect the odor of the marijuana stored in the warehouse"); United States v. Seals, 987 F.2d 1102, 1106 (5th Cir.1993) ("A dog `sniff' is not a search."); United States v. Vasquez, 909 F.2d 235, 238 (7th Cir.1990) (concluding that sniff of garage from public alley was not a search); United States v. Colyer, 878 F.2d 469, 477 (D.C.Cir.1989) (holding that dog sniff of train sleeper compartment was not a search); United States v. Burns, 624 F.2d 95, 101 (10th Cir.1980) (stating that "olfactory activities of a trained police dog legitimately on the premises do not constitute a search" and holding that dog sniff of briefcase in motel room did not violate constitution); United States v. Marlar, 828 F.Supp. 415, 419 (N.D.Miss.1993) (holding that dog sniff of motel room door was not a search); but see United States v. Thomas, 757 F.2d 1359, 1367 (2d Cir.1985) (holding that dog sniff at front door of apartment was a search under the Fourth Amendment requiring warrant based on probable cause); but cf. United States v. Whitehead, 849 F.2d 849, 853 (4th Cir.1988) ("[T]he brief exposure of the interior of a train compartment to narcotics detection dogs is constitutionally permissible when based on a reasonable, articulable suspicion that luggage within the compartment contains contraband.").

Somewhat confusingly, while the Second Circuit in Thomas, 757 F.2d 1359, held that a dog sniff at a front door of an apartment was a search, the Second Circuit more recently held that a dog sniff in the front yard of a home was not a search because the defendant "had no legitimate expectation of privacy in the front yard of his home insofar as the presence of the scent of narcotics in the air was capable of being sniffed by the police canine." United States v. Hayes, 551 F.3d 138, 145 (2d Cir.2008) (citing Caballes, 543 U.S. at 409-10, 125 S.Ct. 834).
[16] See State v. Guillen, 222 Ariz. 81, 213 P.3d 230, 234 (App.2009) ("[W]e join the majority of jurisdictions in concluding that ... a dog sniff reaching into a home does not rise to the level of a `cognizable infringement' under the Fourth Amendment to the United States Constitution."), vacated on other grounds, 223 Ariz. 314, 223 P.3d 658 (2010); Stabler v. State, 990 So.2d 1258, 1263 (Fla. 1st DCA 2008) (holding that dog sniff at front door of apartment was not a search within the meaning of the Fourth Amendment because "it did not violate a legitimate privacy interest"); People v. Guenther, 225 Ill.App.3d 574, 167 Ill.Dec. 705, 588 N.E.2d 346, 350 (1992) (applying Place and Jacobsen to conclude that "[s]ince a canine sniff does not constitute a search, and the police had probable cause to believe there was marijuana in the living room, the police could have brought in the dog"); Hoop v. State, 909 N.E.2d 463, 468 (Ind.Ct.App.2009) (holding that dog sniff at front door of residence was not a search under the Fourth Amendment, explaining that "[a]s long as an officer is lawfully on the premises, the officer may have a dog sniff the residence without implicating the Fourth Amendment"); Fitzgerald v. State, 384 Md. 484, 864 A.2d 1006, 1017 (2004) ("[A] dog sniff of the exterior of a residence is not a search under the Fourth Amendment. To be sure, the dog and police must lawfully be present at the site of the sniff."); People v. Jones, 279 Mich.App. 86, 755 N.W.2d 224, 228 (2008) (holding that dog sniff outside front door of home was not a search under the Fourth Amendment and explaining that "a canine sniff is not a search within the meaning of the Fourth Amendment as long as the sniffing canine is legally present at its vantage point when its sense is aroused"); People v. Dunn, 77 N.Y.2d 19, 563 N.Y.S.2d 388, 564 N.E.2d 1054, 1056 (1990) (holding dog sniff at door of apartment from common hallway was not a search within the meaning of the Fourth Amendment "[s]ince the `canine sniff' conducted outside his apartment could reveal only the presence or absence of illicit drugs"); Romo v. State, 315 S.W.3d 565, 573 (Tex.App.2010) ("[The dog's] sniffs of the garage door and the backyard fence [which were accessible from public alley] were not searches under the Fourth Amendment ... because he sniffed areas that were not protected from observation by passersby and because Romo had no reasonable expectation of privacy in the odor of marihuana coming from his backyard."); Smith v. State, No. 01-02-00503-CR, 2004 WL 213395, at *4 (Tex. App.2004) (concluding that dog sniff of house's garage door was not a search under the Fourth Amendment and explaining that "[u]nlike the surveillance device used in Kyllo, a drug-dog sniff does not explore the details of a house" because it "can do no more than reveal the presence or absence of contraband"); Rodriguez v. State, 106 S.W.3d 224, 229 (Tex.App.2003) (holding that dog sniff of front door of private residence was not a search, reasoning that "a government investigative technique, such as a drug-dog sniff, that discloses only the presence or absence of narcotics, and does not expose noncontraband items, activity, or information that would otherwise remain hidden from public view, does not intrude on a legitimate expectation of privacy and is thus not a `search' for Fourth Amendment purposes"); Porter v. State, 93 S.W.3d 342, 346-47 (Tex.App.2002) (distinguishing Kyllo and holding that dog sniff of front door of home was not a search); see also Nelson v. State, 867 So.2d 534, 536-37 (Fla. 5th DCA 2004) (holding that dog sniff of hotel room door was not a search); but see State v. Ortiz, 257 Neb. 784, 600 N.W.2d 805, 816-17, 819 (1999) (holding that a dog sniff of a private residence implicates the Fourth Amendment by relying primarily on other state courts' decisions interpreting state constitutions); State v. Woljevach, 160 Ohio App.3d 757, 828 N.E.2d 1015, 1018 (2005) ("The information obtained from the drug-detecting dog is not available to support the warrant, because the use of the dog on appellant's property was a search that, unlike using a drug-detecting dog to sniff around a vehicle on a highway or around luggage in a public place, must itself have been premised on probable cause.").
[17] Even the dissenting justices in Caballes acknowledged that the United States Supreme Court has held that dog sniffs are not searches because they only reveal contraband in which there is no legitimate expectation of privacy protected by the Fourth Amendment. See Caballes, 543 U.S. at 411, 125 S.Ct. 834 (Souter, J., dissenting) ("At the heart both of Place and the Court's opinion today is the proposition that sniffs by a trained dog are sui generis because a reaction by the dog in going alert is a response to nothing but the presence of contraband. Hence, the argument goes, because the sniff can only reveal the presence of items devoid of any legal use, the sniff `does not implicate legitimate privacy interests' and is not to be treated as a search." (citations and footnote omitted)); Caballes, 543 U.S. at 421, 125 S.Ct. 834 (Ginsburg, J., dissenting) ("Dog sniffs that detect only the possession of contraband may be employed without offense to the Fourth Amendment, the Court reasons, because they reveal no lawful activity and hence disturb no legitimate expectation of privacy.").
[18] As the highest court in Maryland explained, "The Supreme Court precedent [makes] clear that the status of a dog sniff does not depend on the object sniffed." Fitzgerald, 864 A.2d at 1016. This is so because, as the highest court in New York explained, "[w]hether or not there exists a heightened expectation of privacy, the fact remains that a `canine sniff' reveals only evidence of criminality." Dunn, 563 N.Y.S.2d 388, 564 N.E.2d at 1057 (citations omitted).